## Bank for Savings *v.* The Collector.

1. Savings banks which receive deposits and lend the same for the benefit of their depositors, although they may have no capital stock, and neither make discounts nor issue any money for circulation, are "engaged in the business of banking" within the meaning of the first clause of the 110th section of the Revenue Act of 30th June, 1864, which enacts that "there shall be levied, collected, and paid a duty of $\frac{1}{24}$th of 1 *per cent.* each month upon the average amount of the *deposits* of money . . . . . with any person, bank, association, corporation, or company *engaged in the business of banking.*"

2. On the repeal of the proviso to that section, which declared that the section should not apply "to any savings bank having no capital stock, and whose business is confined to receiving deposits and loaning the same on interest for the benefit of the depositors only, and which do no other business of banking," such savings banks became subject to the duty imposed by the principal enactment.

3. Moneys received by such banks from depositors become "deposits" within the meaning of the act as soon as they are received, and as such are immediately subject to taxation.

4. In interpreting a section of a statute which remains in force, resort may be had to a *proviso* to it, although the proviso be repealed.

· The 110th section of the Internal Revenue Act of June 30, 1864, enacted as follows:

"There shall be levied, collected, and paid a duty of $\frac{1}{24}$th of one per cent. each month upon the average amount of the *deposits* of money subject to payment by check or draft, or represented by certificates of deposit, or *otherwise*, whether payable on demand or *at some future day*, with any person, *bank, association, company, or corporation, engaged in the business of banking.* . . . .

"And a duty of $\frac{1}{24}$th of one per cent. each month, as aforesaid, upon the average amount of the capital of any bank, association, company, or corporation, or person engaged in the business of banking beyond the amount invested in United States bonds.

"And a duty of $\frac{1}{12}$th of one per cent. each month upon the average amount of circulation issued by any bank, association, corporation, company, or person; including as circulation all certified checks, and all notes and other obligations calculated or intended to circulate or be used as money.

496 BANK FOR SAVINGS v. THE COLLECTOR. [Sup. Ct.

Statement of the case.

"PROVIDED, That this section shall not apply to associations which are taxed under and by virtue of the act 'to provide a national currency,' &c. . . . . [Nor to any savings bank having no capital stock, and whose business is confined to receiving deposits and loaning the same on interest for the benefit of the depositors only, and which do no other business of banking."]

By an act of March 3, 1865—an act itself of numerous pages—amendatory of the former one, and inserting or striking out passages all through it, this 110th section was amended by "striking out" that part of the proviso relating to savings banks, and above inclosed in brackets.

In this state of the revenue statutes, "The Bank for *Savings* in the City of New York," a respectable institution, incorporated by the State of New York, A.D. 1819, was existing in the city just named. The features which, under its charter and by-laws, distinguished, as was conceived by its managers, this corporation from those which exercise to some extent the same functions, and especially from ordinary *banking corporations* and *associations*, were apparently these:

1. It was incorporated, not for private gain, but upon the application of the Society for the Prevention of Pauperism in the City of New York.

2. It had no capital stock.

3. It had no shareholders, and no corporators interested in or entitled to participate in the profits of the institution.

4. The corporators were the "trustees" for the time being, who constituted the "Board of Managers." These were prohibited from directly or indirectly receiving any pay or emolument for their services; neither could they have any interest in the deposits or the profits arising therefrom.

5. It was prohibited from issuing notes, making discounts, or transacting any business which belongs to or is transacted by incorporated banks other than is specified in the act, and from lending money "upon notes, bills of exchange, drafts, or any other personal securities whatever."

6. It was enjoined and required to use the funds intrusted to it, and exercise the powers conferred for the promotion of the objects stated in the preamble to its charter, viz.,

" encouraging in the community habits of industry and economy, by securing and investing in government securities or stock created and issued under and by virtue of any law of the United States, or of this State, *and in no other way, such small sums of money as may* BE SAVED *from the earnings of tradesmen, mechanics, laborers, minors, servants, and others,* thereby affording the twofold advantage of security and interest."

Its object, as declared in the preamble, was " to ameliorate the condition of the poor and laboring classes of the community."

[Power was subsequently given to invest in the debt of the city of New York, and to lend upon bond secured by mortgage upon unincumbered real property in the city of New York; and the institution was subjected to a closer scrutiny by the officers of the State.]

7. *All the profits* derived from the business were divisible *ratably semi-annually* among the depositors, except that a small percentage was permitted to be retained for accumulation, to prevent or to make good any loss to the depositors by reason of a reduction in the market price of securities or stocks held below the par value.

8. Money, when received by it from its depositors, was to be entered in a *pass book,* which, when presented, was a voucher or warrant for payments made by the bank and entered in the book; and the corporation—which by its charter had power to pay cash to depositors when required, and at such times and with such interest and under such regulations as the trustees should from time to time prescribe—could by its by-laws only be called upon to make payments either of principal or profits on *four stated days* in the year, and then only *upon a week's notice* of the intended call. It was at liberty, however, to return all or any part of any deposit whenever it thought proper; and moneys might " be voluntarily paid by the bank daily and without such notice, and without thereby waiving the right of the bank to such notice and time of payment."

One of its by-laws was that " all *drafts* must be made per-

sonally, *or* by order in writing, . . . . . and must be accompanied by the pass book."

9. All the money received by it under the charter was, and at all times had been, either actually invested in stocks or lent on bond and mortgage, except some small sum which was kept on deposit in a bank of deposit in the city for current expenses, or waiting an opportunity to invest.

10. Deposits of $1, or of any number of dollars, were receivable; but no person, "except in rare and special cases," and with the special direction of the attending committee, was allowed to have with the corporation moneys amounting in the aggregate to more than $1000, and in no case could the amount exceed $5000. Those having less than $500 with the corporation were, by law, entitled to receive one per cent. more of the profits than the others.

11. A large proportion of the depositors, it appeared, had incomes less in amount than $600 per annum, and were not liable to pay an income tax.

12. Courts were enjoined, by the charter of the institution, to construe the act of incorporation favorably and benignly for every beneficial purpose therein intended.

It was not asserted that the corporation had in any way exceeded its powers, or violated the laws of its creation.

The character of its "depositors" appeared from a return of the new ones in 1865. These numbered 13,071; of whom 5905 were married women, minors, &c.; 300 washers, 571 seamstresses, 798 laborers, 1534 domestics. About four-fifths of the deposits were in sums of less than $100.

It may be here well to add that the statute of 1864, already spoken of, enacts by its 79th section thus:

"Every person, firm, or company, and every incorporated or other bank having a place of business where credits are opened by the deposit or collection of money or currency, subject to be paid or remitted upon draft, check, or order; or where money is advanced or loaned on stocks, bonds, bullion, bills of exchange, or promissory notes; or where stocks, bonds, bullion, bills of exchange, or promissory notes, are received for discount or sale shall be regarded a *banker* under this act.

" PROVIDED, That any savings bank, having no capital stock, and whose business is confined to receiving deposits and loaning the same for the benefit of its depositors, and which does no *other business of banking*, shall not be liable to pay for a license as a banker."

In the amendatory act of 1865, the above given proviso to this 79th section, a proviso which, the reader will have observed, much resembles that to the 110th section, was *not* stricken out.

The directors of the institution, conceiving that this was not a corporation " engaged in the business of banking," nor otherwise within the sections of the act already quoted, made no returns for several months to the assessor of the United States of the average amount of the deposits out on loan or invested for individuals in pursuance of its charter, as every corporation engaged in the business of banking is required to do.   Hereupon the assessor estimated the amount as the statute provides in cases of delinquency, and these being returned to and adopted by the commissioner, the last-named officer gave a warrant to the collector of the district, to col- lect the amount as estimated and assessed, with penalties. The collector, being about to proceed accordingly, the cor- poration filed a bill in the Supreme Court of New York to enjoin him.  A preliminary injunction having been granted there, the case was removed by *certiorari* into the Circuit Court of the United States for the Southern District of that State.

The case coming on to be tried, the judges there were di- vided on the following questions :

1. Whether the Circuit Court could restrain the collection of the tax and penalties by injunction ?

2. Whether an injunction could properly issue in *this* case ?

3. Whether under the 110th section of the act of June 30th, 1864, as amended by the act of March 3d, 1865, the corporation was liable to pay a duty of $\frac{1}{24}$th of *one per cent.* per month on the average amount of money so received and invested or lent as aforesaid, and represented and entered in the pass-book as afore-

said, and payable to the parties entitled under the laws of the corporation already sufficiently set forth.

4. Whether moneys so received and invested were deposits within the meaning of the acts of Congress.

5. Whether moneys received on deposit in any one month and invested as aforesaid during the same month, were deposits within the meaning of the said acts, so as to render the plaintiff liable to pay a tax thereon for such month.

And on a certificate of division these questions were now before this court.

*Messrs. Allen, Strong, and Bidwell, for the Bank for Savings :*

The main question, and the one upon which all the others turn, is this:

Are these moneys—received for investment, and actually invested, or permanently lent for the sole benefit of the owners, and repaid with the profits, if any have been earned, at stated periods upon notice, upon a prescribed voucher, and upon presentation of the "pass-book" as a voucher,—taxable as "deposits with a person or corporation engaged in the *business of banking.*"

The other questions are unimportant. If the decision upon the merits is adverse to the plaintiff, the injunction necessarily falls, and if adverse to the United States there will be no attempt to enforce the collection of the tax. The questions, as to the injunction, are, therefore, as presented here, abstract questions, without particular interest.

The third and fourth questions are substantially the same, expressed in different terms, and must receive the same answers.

Now, this institution is not a "bank," by which term, in an unqualified presentation of it, is meant a bank of the ordinary kind. It is a Bank for *Savings* only. But if it still be a bank,—that is to say, a common repository for people's money, having a bench or counter,—it is assuredly not a bank "engaged in the business of banking." The business of banking consists in buying, selling, and discounting commercial paper, with or without collaterals; in issuing notes;

in making collections, and in receiving deposits of money and in paying them out on check, at call.  This bank is engaged in none of these things.  Will it be said that one sort of banks is banks of deposit, and that this is of that class?  Certainly it is not of that class as *commonly* so called.  Deposits in *any* sense of the term cannot generally be made in this "Bank for *Savings:*" and in the ordinary, popular commercial sense—which is the legal sense, also—and the sense in which, when used without restriction, the word "deposits" must be presumed to be used in the statute*—deposits, in no sense can.  What is meant by the word "deposit?"  In its widest sense it applies to any material thing laid down; other things as well as money.  But in connection with banking and in ordinary commercial parlance it means money taken to a bank, left there, and understood to be subject to check or draft.†  Money thus deposited and drawn on enters largely into the commerce of the country : checks and drafts are mercantile instruments, part of the machinery of trade, having commercial value and bearing no resemblance to the "pass-book" held by the poor seamstress, or washerwoman, or cook, who can go but four times a year and after notice to have a debit entered in it.

Neither, on the other hand, do "banks,"—*i. e.* companies or corporations "engaged in the business of banking" perform services like those performed by this bank for *savings.*  The business of receiving, investing, or lending out the "savings" of the industrious poor, for the benefit of the poor themselves and irrespectively of advantage to the corporators, is not engaged in by any bank, whether the bank be one of deposit, or one of discount, or one of circulation, or, finally, one of all three characters combined.  Banks avoid the poor; they seek, and properly, the rich : those who have

---

\* Hallewell *v.* Morrell, 1 Scott's New Reports, 309.

† Bouvier's Law Dictionary, tit. Banker : where a banker is defined, "One engaged in the business of banking; receiving other people's money on deposit, *to be returned on demand,* discounting other persons' notes, and issuing his own for circulation." Curtis *v.* Leavitt, 15 New York, 9, 166, 168.

the largest deposits are there the welcomed guests. This institution is the friend and agent of the poor only. The rich are repelled, and those who have small deposits—less than $500—receive greater interest than those who have large ones—over $500. Indeed, banks would not, ordinarily, be permitted to perform the sorts of services which alone are performed by this institution. Public policy has not permitted the savings of the poor to be hazarded by the perils incident to commercial institutions and business.

Both State and national legislatures recognize the distinctive features of the two classes of institutions. The one class may, under the laws of Congress and the laws of most of the States, be organized under general laws, and by the voluntary action of those desiring to associate for gain, and they choose their own trustees or directors. "Banks for savings" are created by special charter, and the trustees or directors named by the legislature, and provision is made for the filling of vacancies in the management by the board itself.

In all books and treatises, "banks," and "banks for savings" are treated of as separate institutions, as distinct in all their characteristics as are "banks" and "insurance companies." *We* in New York call them sometimes "*banks* for savings." In other cities they are known by other names. In Philadelphia they are called universally "saving fund societies." In France they are distinguished from *banques* of any sort; being styled "*caisses* d'eparnes."

It cannot be supposed that Congress intended to make an innovation, and so by the Internal Revenue Act, to confound and make one two classes of institutions, always before regarded as entirely distinct, and having nothing in common between them, except a similarity of title.

What, then, in reality, is this institution? Its mere name, —though its name, a bank or common receptacle or repository for *savings* is not inappropriate—cannot impress upon it qualities which it has not. Its character must be determined by the services rendered and the business transacted, rather than by a title given for convenience or by accommodation, by any one. The "trustees" of the plaintiff are, in truth,

but the trustees of the individuals owning the fund, and for convenience permitted to act in a corporate name; and if the same individuals should perform the same services as individuals associated together for the benevolent purpose that now binds them in a body, it would never have suggested itself to any one that they were bankers or engaged in the banking business, or that the funds of their beneficiaries were taxable as " deposits" with such persons.

Negatively, the company is *not* a commercial institution, or one of business. Its transactions do not enter into or make a part of the ordinary commercial transactions of life. It has no capital and gain, and profit is not made to the corporation or its managers.

It *is* positively, as also pre-eminently and solely, a benevolent institution—a public charity—gratuitously rendering valuable service to the public, to its employers, and to the State.

The relation between the corporation and its poor beneficiaries is that of a TRUST. The money is received for investment, and the plaintiff is liable to account. The special contract evidenced by the entry in the " pass-book," creates the trust, and the relation of trustee and *cestui que trust,* between the plaintiff and the individuals availing themselves of its services, and the rights and obligations springing out of the contract are those incident to the relation named. The money to which the *cestui que trust* is entitled, may be more or less than the sum deposited, depending upon the result of the investments. The relation of debtor and creditor as distinguished from that of trustee and *cestui que trust* is probably not created and does not exist.

The whole force of any argument which can be made in opposition to our view must rest, we suppose, on the fact, that by a *proviso* to the 110th section of the act of 1864, this class of banks was by a specific description of their functions excluded, and that by the act of 1865 this proviso was repealed. But if it be clear that under the general or substantive enactment the institution was *not* liable, the proviso was

useless to discharge it, and the repeal of the proviso leaves the case where it was. Suppose it were enacted that all *white male* citizens of the age of twenty-one years shall pay a poll-tax, *provided* that no *women* or *children* shall be so charged. Could it be inferred from a repeal of such a proviso that women and children were meant to be made chargeable? Would it not rather be inferred that the proviso had been seen to be useless or absurd, and had been repealed on that account? Whatever might or might not be inferred, the repeal of the useless proviso would leave the principal and preceding enactment where it was; and if by *it* they were not charged they would not be chargeable at all.

So, too, here. This institution for savings, not being an institution in any way engaged " in the business of banking," its deposits were not liable under the principal enactment which makes liable to the tax no deposits but those of institutions so engaged. The proviso which exempts institutions for " savings" was therefore unnecessary; and, philologically, perhaps, even worse. It did but redeclare in a literal form that which was already declared in a legal and commercial and orthoepical and scientific one. The repeal of such a proviso, of course, left the preceding enactment where it was; that is to say, without savings banks included.

We all know that enactments are frequently made which do but declare what was already law; what would have existed just as well if the enactment had never been made. This is no strange circumstance in legislation. This term affords a case of this sort.* Especially is the observation true of what are called *provisos :* appendages, or clauses cast in adjectitiously at the suggestion of some one to remove a doubt which *he* had, or, more probably, supposed that some one else *might* have, but which no one would have had, and which, whether or not, would never have been declared a well-founded doubt by the law. Our internal revenue laws, the fruit of our civil war, have been recently and hastily enacted, in a crisis and emergency. They are enactments of

---

* See *supra*, p. 293; Cincinnati City *v.* Morgan.—REP.

immense magnitude, of a sort which was quite new to us; filled with obscure or incongruous provisions; and which if interpreted as some persons would seek to interpret them would seem to have been passed to show that Congress was seeking to exercise a despotism over the English language and to shame our mother tongue. In the present case we submit that the proviso was inserted *ex cautelâ* only, and, on a revision of the whole statute, has been repealed as superfluous

Consider this question on public policy and legislative probabilities. What are these " saving banks" or " saving funds," which exist in England, France, and all over the North of our own country?

In the State of New York there are seventy-three savings banks:*

Total deposits, . . . . . . . $111,793,425
Number of depositors, . . . . . . 456,721

The average amount of savings belonging to each depositor is $244 and a fraction; and there is about *one* depositor to every *nine* of the inhabitants.

In the New England States there are two hundred and twenty-two savings banks:

Total deposits, . . . . . . . $119,382,941
Number of depositors, . . . . . . 527,090

The average amount of savings belonging to each depositor being $226 and a fraction.

Of the number and character of the depositors in the institution before the court, the reporter gives some mention in his statement

The annual percentage of increase in savings, fostered and encouraged, if not in truth, wholly induced by these institutions, has been very great within the last few years. In New England it was thirty per cent. from January, 1862, to January, 1865. In New York greater.

A reference to the savings of Great Britain, in comparison with those in New England and New York, will show the

---

* Bankers' Magazine for July, 1865.

beneficial workings of these institutions, and that the true policy of the government is not to burden them with taxes of any description. Great Britain, with a population of 30,000,000, has aggregate savings deposits equal to $190,-494,406, or about $6.33 per head. New England and New York, with a population of 7,500,000, has an aggregate savings deposit of $231,176,366, *or about $30 per caput.*

It will not be denied that the greater part of these savings are the fruits of institutions for savings, and that the laborers, mechanics, married women, and infants to whom they belong, would, but for the facilities for investment for accumulations of small sums thus afforded, have parted with them as they were earned, and that the State would have been the loser, the individuals so much the poorer, and the habits of thrift and good morals would have lacked the encouragement they now have.

Certainly, no wise government will tax institutions of these kinds, conducted upon principles and with motives such as govern the one here sought to be charged. They stand on the same footing as schools, churches, orphan asylums, hospitals, and those other foundations of religion and charity, and providence for the poor, which make the honor and glory of any land.

If well-known principles of law have settled it—as they have—that every act placing an imposition or tax upon the citizen is to be construed strongly against the government and liberally in favor of the citizen—that such acts are never to be extended by implication, and that their application will be restricted to cases within their spirit as well as to those within their words, with what an emphasis of reason do the principles apply to a case like this, where the collector seeks to take from the *capital* deposited in these institutions,—the capital of the poor, of even the very poor; " men who work for their daily pay; women who perform domestic services for their weekly wages; persons who have garnered up their little treasures, the dearer treasure to them as it has been pinched off and hoarded from the scanty supply of their personal comfort;" persons who have little power to protect

themselves against the arm of power, and who now look to this court only as their earthly avenger.

*Mr. Speed, A. G., and Mr. Assistant Attorney-General Ashton, contra.*

Mr. Justice CLIFFORD delivered the opinion of the court.*

Immediate purpose of the suit in this case was to restrain the respondent, as the collector of internal revenue for the sixth collection district of the State of New York, from collecting certain internal duties or taxes assessed against the corporation complainants, by the commissioner of internal revenue.   Charter of the complainants was granted by a special act of the legislature of the State of New York, passed on the twenty-sixth day of March, 1819, and entitled An Act to incorporate an association by the name of a Bank for Savings in the City of New York.

Statement of facts as proved or admitted shows that the complainants did business in the city of New York under that act of incorporation, and certain other acts of the legislature of the State, as detailed in the record from the date of their charter to the time of the filing of the bill of complaint. Complainants denied that they were subject to the payment of any internal duties or taxes as a savings bank, and they accordingly neglected and refused to make any returns either to the commissioner of internal revenue or to the assessor of the district.   Failing to receive such returns the assessor of the district estimated the average amount of their deposits for the periods specified in the record, and certified the same to the commissioner of internal revenue as required by law in case of delinquency.

Assessor's estimates as certified were adopted by the commissioner as correct, and he thereupon proceeded to assess the duties or taxes in controversy, adding thereto certain penalties for the neglect and refusal to make the returns as

---

* Field, J., not having sat.

required by the act of Congress, and directed the respondent as the collector of that collection district to collect the amount so estimated and assessed.

1. Exemption from liability to taxation in the case is claimed by the complainants upon the ground that the corporation is not a bank, either in the ordinary and popular sense or in the legal sense of that word, and they allege that they have never transacted any business of banking within the meaning of the acts of Congress under which the duties or taxes were estimated and levied. Respondent in his answer alleged that the complainants were an incorporated savings bank within the usual and proper meaning of that term, and that as such they have been and were engaged in the business of banking as assumed by the revenue officers. Wholly unable to agree in opinion, the judges of the Circuit Court certified five questions to this court for decision, but in the view taken of the case it will not be necessary to examine the first two, as the answers to be certified to the other three will enable the Circuit Court to dispose of the cause.

2. Substantial import of the third question is whether the complainants are liable under the internal revenue acts to pay a duty of one-twenty-fourth of one per cent. per month on the average amount of money which they receive and invest or loan, as described in the statement of facts exhibited in the record.

Their powers are set forth in their charter and the other acts of the legislature to which reference has been made. Purpose of the charter as described in the preamble is to encourage in the community habits of industry and economy, by receiving and investing in government securities or in Federal or State stocks, such small sums of money as may be saved from the earnings of tradesmen, mechanics, laborers, minors, servants, and others. They are constituted by the first section of the charter a body corporate and politic by the name of the Bank for Savings in the City of New York, and the provision is, that by that name they shall have perpetual succession, and that they shall be capable of suing

and being sued, pleading and being impleaded, and defend-
ing and being defended in all courts and places whatsoever.
Power to hold real and personal estate to such an amount as
may be necessary for the purposes of the incorporation is
also conferred, provided that the clear annual value thereof,
exclusive of profits arising from interest or from the sale of
any stock in which the deposits made in the bank may be
invested, shall not exceed the sum of five thousand dollars.

Trustees or managers are appointed by the act of incorpo-
ration, but they are forbidden to receive any pay or emolu-
ment for their services, and it is provided that they shall not
" issue any notes, make any discounts, or transact any busi-
ness which belongs to or is transacted by incorporated banks,
other than is herein specified." Funds of the corporation
are required to be used and appropriated for the promotion
of the objects stated in the preamble, and the second section
of the charter provides, in effect, that the association shall
receive as deposits, from persons of the description men-
tioned in the recital to the act, all sums of money which
may, on the terms specified, be offered for that purpose, and
that the same shall be invested accordingly, and shall be re-
paid to the respective depositors when required, and at such
times, and with such interest, and under such regulations as
the trustees shall from time to time prescribe.

3. Such trustees may make by-laws and regulations, and
they are expressly required by the charter to regulate the
rate of interest to be allowed to depositors, so that they shall
receive a ratable proportion of all the profits of the bank
after deducting all necessary expenses. Authority is con-
ferred upon the trustees to manage the affairs of the bank,
and for that purpose to appoint clerks and fix their salaries,
but they are required to make an annual report of their
funds to the legislature and to common council of the city.
Subsequent enactments very much enlarged the powers of
the trustees, and subjected the bank to a much closer scru-
tiny by the proper authorities of the State. Investment of
the funds under those additional provisions may be made in
any State stocks, where the faith of the State is pledged for

their redemption, or the moneys received on deposit may be loaned on bonds secured by mortgage of real estate in the city where the bank is located.  They are also authorized to accumulate and "hold invested" a surplus fund, not exceeding ten per cent. on the amount of deposits, as a protection to depositors against loss in case of the reduction in the market price of their securities.  Bank commissioners have the power to visit and inspect the bank under existing laws whenever they deem it necessary, or whenever thereto required by the comptroller of the State, and they are required to report the general condition of the bank to the legislature once at least in every three years.

4. Intention of Congress undoubtedly was, to impose a duty of one-twenty-fourth of one per centum each month, upon the average amount of deposits of money, subject to payment by check or draft, or represented by certificates of deposit, or otherwise, whether payable on demand, or at some future day, if made with any person, bank, association, company, or corporation engaged in the business of banking, except deposits with associations which were taxed under and by virtue of the act " to provide a national currency," and with savings bank having no capital stock, and whose business was confined to receiving deposits and loaning the same on interest, for the benefit of the depositors only, and which were doing no other business of banking.* Confirmation of that view is derived from the language of the next clause, which imposes the same duty upon the average amount of the capital of any bank, association, company, or corporation, or person engaged in the business of banking, beyond the amount invested in United States bonds.

Savings banks having no capital are not included in that provision; nor are they included in the next succeeding clause, which imposes a duty of one-twelfth of one per cent. each month upon the average amount of circulation issued by any bank, association, corporation, company, or person, including as circulation, all certified checks, and all notes

and other obligations calculated or intended to circulate or to be used as money. Such savings banks having neither capital nor circulation, did not fall within the words of either of those clauses, and consequently it did not require any proviso to exclude them from the operation of those provisions. But those banks, as banks of deposit, did fall directly within the words of the first clause of the section, and therefore it became necessary to insert the proviso near the close of the section, to exclude them from the otherwise plain meaning and operation of the clause.

Precise language of the proviso is, that the section shall not apply " to any savings bank having no capital stock, and whose business is confined to receiving deposits, and loaning the same on interest, for the benefit of the depositors only, and which do no other business of banking." More exact description of the corporation complainants than is expressed in the language of that proviso, could not be conceived; and it amounts to a legislative enactment, that the receiving of deposits and loaning the same on interest, for the benefit of the depositors, is a business of banking. Throughout the section the distinction between deposits, capital, and circulation as separate objects of taxation, is clearly maintained and enforced, both in respect to the monthly returns and the monthly payment of the duties.

Same remarks apply to the seventy-ninth section of the act, which requires bankers to pay a certain sum for a license, and defines the meaning of the word as used in the section. Doubt cannot be entertained that the definition as there given would have included savings banks having no capital stock, but for the proviso annexed to the clause, which is in the very words of the proviso under consideration.

5. Argument for the complainants is, that the proviso was only inserted out of abundant caution, and that it was unnecessary, inasmuch as such an association was not included in the substantive words of the section; but it is not possible to sustain that proposition for the reasons already given, as well as others which will be briefly stated. 1. Unquestion-

ably the complainants receive deposits as one of the primary purposes of the charter, and the second by-law of the bank provides, that "deposits of one dollar, or any number of dollars, may be received, but are not, in the whole, to exceed one thousand dollars from any depositor, without the special direction of the attending committee." General rule is, that no depositor is allowed to have deposits beyond one thousand dollars; but he may have that amount, and, in special cases, when it is made to appear that he can find no other investment, he may exceed that amount. 2. By the terms of their charter they are obliged to pay each depositor, when required, "and at such times, and with such interest, and under such regulations as the trustees shall from time to time prescribe."

Obligation of repayment exists throughout, and it cannot make any difference as to the liability of the complainants in this case that the entries are made in a pass-book, and that the depositors can only obtain their deposits at certain stated periods. Deposits are made to be invested for the benefit of the depositors, and the bank is under obligations to repay the amount when demanded, agreeably to the by-laws and charter. 3. Only remaining condition to bring the case within the words of the body of the act is, that the deposits should be made with a person, bank, association, company, or corporation engaged in the business of banking. Agreed case shows that the corporation complainants were engaged in receiving deposits, and loaning the same on interest for the benefit of the depositors. Irrespective of the definition given to that phrase in the language of the proviso, the same conclusion must be adopted from the facts exhibited in the statement of the case, unless it can be established that the receiving of deposits by a chartered company, and loaning or investing the same for the benefit of the depositors, is not a business of banking.

Banks, in the commercial sense, are of three kinds, to wit: 1, of deposit; 2, of discount; 3, of circulation. All or any two of these functions may, and frequently are, exercised by the same association; but there are still banks of deposit,

without authority to make discounts or issue a circulating medium.*

"Banks for savings," says McCulloch, "are banks established for the receipt of small sums deposited by the poorer class of persons for accumulation at interest."† Definition given by Grant is more extended, but it amounts to the same thing.‡ Courts of justice, also, as well as text writers, recognize the well-known distinction between banks of deposit and banks of discount or circulation.§

6. Beyond all controversy the proviso, while it continued in force, had the effect to exclude the corporation complainants from the operation of the substantive words of the section. Since the passage of the act, however, the proviso has been stricken out, and the palpable effect of the repeal is to leave the body of the act in full force and operation, without any such qualification as was imposed by the proviso.‖ Although the proviso is repealed, still it is proper to resort to it as well as to the proviso in the seventy-ninth section of the same act, as affording a legislative exposition of what is meant by the phrase, engaged in the business of banking, as employed in the first clause of the section under consideration. Looking at the case, therefore, in any point of view, it is clear that the answer to the third question must be in the affirmative.

7. Fourth question presented for decision is, whether the moneys so received on deposit and invested, are deposits within the meaning of the act of Congress. Obviously the question as presented is substantially answered by the remarks already made in disposing of the preceding question. All the moneys received by the bank, whether for safe-keeping or for investment, are deposits within the meaning of their by-laws, and within the very words of their charter. Answer to this question, also, must be in the affirmative.

---

* Angel & Ames on Corporations, § 55; McCulloch's Commercial Dictionary, 73.          † Id. 146.          ‡ Grant on Banking, 614.

§ Duncan v. Savings Institution, 10 Gill & Johnson, 309; People v. Utica Insurance Co., 15 Johnson, 390; Grant on Banking, 1, 6, 381, 614.

‖ 13 Stat. at Large, 479.

8. Fifth question is, whether moneys received on deposit in any one month, and invested during the same month, are deposits within the meaning of said acts, so as to render the complainants liable to pay a tax thereon for such month. Moneys received, as already explained, whether invested or not, are deposits within the meaning of the acts of Congress, and if so, then it is clear that the amount, whatever it may be, is liable to taxation as soon as it is received by the bank, because when received by the bank, it becomes deposits, and continues to be such till it is repaid to the depositor. An affirmative answer must also be certified to this question.

No answers will be certified to the first two questions, because the court is of the opinion that those given to the others are sufficient to dispose of the cause.

ANSWERS ACCORDINGLY.

GRIER and NELSON, JJ., dissented; FIELD, J., who, as already said, had not sat in the case, took no part in the judgment.