(No. 22003.—

FRANK KNASS *et al.* Appellants; *vs.* THE MADISON AND KEDZIE STATE BANK *et al.*—(THE MADISON-KEDZIE TRUST AND SAVINGS BANK, Appellee.)

*Opinion filed December 22, 1933—Rehearing denied Feb. 8, 1934.*

SHULMAN, SHULMAN & ABRAMS, (MEYER ABRAMS, of counsel,) for appellants Frank and Dina Knass.

SIMS, STRANSKY & BREWER, and RYAN, CONDON & LIVINGSTON, (FRANKLIN J. STRANSKY, JAMES G. CONDON, OTTO W. BERG, and JOHN J. SHARON, of counsel,) for appellants the Madison and Kedzie State Bank *et al.*

WINSTON, STRAWN & SHAW, (SILAS H. STRAWN, RALPH M. SHAW, HAROLD BEACOM, and HAROLD A. SMITH, of counsel,) for appellee.

Mr. JUSTICE STONE delivered the opinion of the court:

This cause is here on appeal and certificate of importance granted by the Appellate Court for the First District to review the judgment of that court which reverses in part and affirms in part the decree of the superior court of Cook county.

One Frank Knass and his wife, Dina, filed an amended bill against the Madison and Kedzie State Bank and the Madison-Kedzie Trust and Savings Bank, both banking corporations, for specific performance of a contract to repurchase real estate mortgage bonds and for an accounting. The appeal from the Appellate Court and certificate of importance of that court have been granted on the motion of Frank and Dina Knass, who are hereinafter designated complainants, and on that of the Madison and Kedzie State Bank, herein designated the old bank, and its receiver. These appeals have been consolidated here. The Appellate Court affirmed the decree as to the old bank and its receiver and reversed it as against the Madison-Kedzie Trust and Savings Bank, hereinafter referred to as the new bank, except as to costs. The new bank appears here as appellee.

The bill alleges that prior to February 10, 1930, the old bank was a banking corporation incorporated under the laws of this State, and that on that date the new bank was organized and became the successor of the business formerly owned by the old bank and was at the time of the

filing of the bill in possession of all of the assets of the old bank and engaged in general banking business in the premises formerly occupied by the old bank. It is alleged that on August 1, 1928, complainants were solicited by duly authorized agents of the old bank to purchase real estate securities in the form of first mortgage gold bonds placed by it on the market; that in order to induce complainants to purchase these gold bonds, the old bank, by its agent, represented that they were secured by real estate in Cook county which had been appraised by the bank to be much in excess of the respective issues of gold bonds against such real estate and were safe and sound securities, and that to induce complainants to purchase these bonds the old bank delivered to them "a bill of sale for such bonds, some of which would contain the following: 'We will re-purchase these bonds at any time after one year at 99 and after three and one-half years at par;' and that others would contain the following clause: 'These bonds may be cashed at any time after one year at 99 and accrued interest or in three and one-half years at par'." The bill alleges that, relying on those representations, complainants on August 1, 1928, began, and thereafter continued, to purchase gold bonds from the old bank, such purchases amounting in all to approximately $100,000, and that all were purchased under the representations and agreements alleged in the bill. It is also alleged that thereafter the old bank recognized and ratified the agreements to re-purchase, and did from time to time until October, 1929, re-purchase from the complainants, pursuant to such agreements, bonds aggregating $60,000, but thereafter refused to be bound by the terms and provisions of the agreement or to take back bonds purchased from it when requested to do so. The bill also alleges that the complainants had found that the representation made to them as to the safety of their investment was false and known to be false when made by the agents of the old bank; that in order to charge

558

large commissions for selling the bonds the old bank procured false appraisals of the real estate on which the bonds were a lien, and that after the new bank had taken over the assets of the old bank, it from time to time paid the interest coupons on various bonds purchased by complainants. The bill also sets out that subsequent to the date on which complainants began purchasing bonds of the old bank, Frank Knass, one of complainants, borrowed $20,000 from the old bank and put up as collateral certain of those bonds of a face value of $25,000; that his note was renewed from time to time and was taken over by the new bank as a part of the assets taken from the old bank, together with the bonds put up as collateral, and that after the formation of the new bank complainants demanded of the new bank that it take back all of the bonds purchased by complainants and still held by them and deduct from the re-purchase price of the bonds held as collateral the amount due on the note, with interest, all of which the new bank refused to do. It is alleged that by reason of the fact that the old bank had ceased to function as a banking institution and had turned over all its assets to the new institution, a judgment at law against the old bank would be of no avail to the complainants, and they in equity ought to be decreed to have a lien for their claims and demands against all of the assets acquired by the new bank. The prayer of the bill is that both banks be required to set forth their accounts in respect to the transfer of the assets from the old to the new bank and any payments made on the bonds held, and that the new bank be decreed to take back the bonds purchased by the complainants, and after deducting one per cent for operating charges and the amount of the collateral note, with interest, to pay over the balance to the complainants. Complainants offer to return the bonds purchased, and pray that the defendants be decreed to pay complainants anything found due on accounting.

The old bank by its answer denied the execution of the agreements as set out in the bill, and likewise denied that it, or any of its officials, had authority to enter into such agreements. It denied that complainants were entitled to any relief whatever. The new bank answered denying that it was in possession of all of the assets of the old bank or that it was successor to it in business, but stating the fact to be that it, under an agreement with the old bank, took over certain of the assets of that bank for the purpose of liquidating them in an orderly manner, and that among those assets were the note of the complainant Knass and the bonds put up by him as security. It also denied that it assumed and agreed to pay the liabilities of the old bank relating to re-purchase agreements or that it in any way became liable on such agreements.

Three major questions are presented on this record as argued by counsel: (1) Whether the notations on the copy of the bills of sale received by complainants with the bonds they purchased are in law and fact contracts of the old bank and enforceable against its receiver; (2) whether such re-purchase agreements, if in fact agreements of the old bank, are *ultra vires* the power of that bank and against the public policy of the State, and therefore unenforceable; and (3) whether, if valid and enforceable as contracts of the old bank, the new bank is bound thereby.

It is not contended that the new bank is bound if no liability exists against the old bank. The facts as shown in the record are, that on August 1, 1928, complainant Frank Knass purchased through one Zinder, a sales agent for the old bank, real estate mortgage bonds in the sum of $6000 and interest. A memorandum of the sale, characterized in the bill as "a bill of sale," was made in duplicate, one copy of which was given to Knass and the other kept by the bank. On the margin of the copy received by Knass there was typewritten the following: "These bonds may be cashed at any time after one year at 99 and ac-

crued interest or in three and one-half years at par." This statement was signed "W. F. Gleason." Gleason was a vice-president of the old bank and in charge of its bond sales. No notation pertaining to the cashing of the bonds appears on the duplicate of the sale memorandum retained by the bank. A few days thereafter Knass purchased, through Zinder, other real estate mortgage bonds amounting to $17,709.40. A similar notation appears on Knass' copy of the memorandum or bill of sale in the following words: "Will purchase these bonds at any time after one year at 99 and after three and one-half years at par if desired." To this notation appears the name W. F. Gleason. The copy of the memorandum or bill of sale retained by the bank did not carry the notation quoted. Thereafter complainants, or one of them, purchased other real estate mortgage bonds as charged in the bill, and on each memorandum or bill of sale received by complainants there appeared the re-purchase agreement in one or other of the forms quoted. Some of such notations bore the signature "W. F. Gleason" and on others the characterization "V. Pres." or "V. P." followed his name. Gleason testified that he for some years had been following the practice of re-purchasing bonds in accordance with notations such as appear on the memoranda of sales in this case. The record contains no evidence, however, of what, if any, authority he had to execute such re-purchase agreements, and it does not appear that the bank kept or had any record of such agreements.

In the early part of the year 1930 the old bank, having invested heavily in real estate securities, found itself in difficulty. It was directed by the Chicago Clearing House Association to write off approximately $3,000,000 of its assets and to substitute therefor liquid assets of sound value and in like amount. The unstable condition of the bank became known, and during the last thirty days prior to February 10, 1930, its deposits decreased substantially. A

new bank was on that date organized under the name of Madison-Kedzie Trust and Savings Bank, (herein referred to as the new bank,) to which all property, assets, business and effects and interest therein, including notes and choses in action, were transferred by the old bank in trust for the benefit of the old bank, in order that its assets might be liquidated in an orderly manner. It was agreed that after applying the proceeds of such assets to certain enumerated liabilities which the new bank assumed, the balance of the proceeds should be turned over to the old bank. William H. Wade was appointed receiver for the old bank and appears as party in this proceeding.

Of first importance on this record is the question whether the re-purchase agreements, assuming them to have been such and to have been made by the bank, are *ultra vires* the powers of the bank and contrary to the declared public policy of the State, and so unenforceable. This question has never been passed upon by this court. For the purpose of considering that question it will be assumed that the notations on the margin of complainants' copy of the bills or memoranda of sale were the agreements or bargains of the bank. Were such agreements or bargains valid, enforceable contracts? The rule long recognized and frequently announced by this court is, that a bank incorporated under legislative charter, like other corporations so organized, has only such powers as are expressly conferred by the statute under which it is organized and such powers as are necessarily implied from the specific grant of power. Every power that is not clearly granted is withheld. Enumeration of powers granted implies exclusion of all others, and any ambiguity in the terms of the grant of power must operate against the corporation and in favor of the public. If a power claimed is withheld, the withholding of such power is to be regarded as a prohibition against its exercise. (*Calumet Dock Co.* v. *Conkling,* 273 Ill. 318; *Fritze* v. *Equitable Building and*

*Loan Society,* 186 id. 183; *American Loan and Trust Co.* v. *Minnesota and Northwestern Railroad Co.* 157 id. 641; *Fridley* v. *Bowen,* 87 id. 151.) Other courts hold the same view. *California Bank* v. *Kennedy,* 167 U. S. 362; *Weckler* v. *First Nat. Bank,* 42 Md. 581.

Under the provisions of section 5 of article 11 of the constitution of this State, acts of the General Assembly creating corporations or associations with banking powers do not go into force and effect unless and until approved by vote of the people as in that section provided. Section 1 of an act entitled, "An act to revise the law in relation to banks and banking," approved June 23, 1919, adopted by the people at election held November 2, 1920, as it existed at the time of these transactions, was as follows: "That on a ratification of this act by a vote of the people in accordance with the constitution of this State, it shall be lawful to form banks and banking associations, as hereinafter provided, for the purpose of discount and deposit, buying and selling exchange and doing a general banking business, excepting the issuing of bills to circulate as money; and such banks or banking associations shall have the power to loan money on personal and real estate security and to accept and execute trusts." (Smith's Stat. 1927, chap. 16½, p. 191.) This section of the Banking act was amended in 1929 and approved by a vote of the people. The amendment, however, in nowise affects the questions involved here.

First, then, does the statute quoted confer on a banking corporation the power to enter into a contract to repurchase, under the terms of these agreements, real estate mortgage bonds executed by a real estate corporation or other person? In fact and in effect an agreement of the character before us is a guaranty to the vendee of a value or selling price of the bonds in the manner and to the extent in such agreement specified. Such a transaction is not a "discount" or "deposit," nor is it buying or sell-

ing exchange as that term is understood in the banking business, nor is such transaction a loan on personal or real security nor the acceptance or execution of trusts. If the power exists it must be found in the authorization to do "a general banking business." The language "doing a general banking business" may not by construction be extended beyond the meaning of like words used in the constitution of the State authorizing the creation of corporations "with banking powers." The words "banking powers," as used in the constitution, were in *Reed* v. *People,* 125 Ill. 592, construed to mean such powers as are ordinarily conferred upon and used by the various banks doing business in the country. The words "general banking powers" are to be used in their common and ordinary sense. The ordinary and usual powers exercised by banks in doing general banking business are to loan money, to discount notes, receive deposits and deal in commercial exchange. They possess other powers, some of which are specifically conferred by statute, but these are the usual powers exercised in doing a general banking business. (*Wedesweiler* v. *Brundage,* 297 Ill. 228; *People* v. *Doty,* 80 N. Y. 225; *Mercantile Nat. Bank* v. *City of New York,* 121 U. S. 138; *Exchange Bank of Columbus* v. *Hines,* 3 Ohio St. 1.) Banking business has expanded as the needs and demands of commercial life have grown. However, unless the power to enter into the re-purchase agreements here involved may be said to come within the meaning of the words "general banking business" or is necessarily implied by the authorization to do general banking business, it falls without the powers granted to banks and under the rule hereinbefore quoted is prohibited. The record contains no evidence of a general use or custom existing in this country to include within the scope of general banking business re-purchase contracts such as are here sued upon, nor can it be said that such a custom is so universally established as to warrant courts in taking judicial notice thereof. Can it be said, then,

that there is anything in the nature of banks which calls for the inclusion of such agreements as within the scope of general banking business? Banks have always been recognized as places for the deposit of money. In the commercial sense they have been treated as of three kinds: First, of deposit; second, of discount; and third, of circulation. Originally the business of banking consisted only in receiving deposits, such as bullion, plate and the like for safekeeping. That business grew to include the discount of bills and notes, loaning money upon mortgage or other security; and national banks, and in some States, for a time, State banks, have been authorized to issue notes of their own intended to circulate as money. The latter practice is no longer allowed to State banks under the constitution of this State. Such have been the nature and powers of banks as recognized by this and other courts. *Reed* v. *People, supra; People* v. *Doty, supra; Bank for Savings* v. *Collector,* 3 Wall. 495; *People* v. *President Manhattan Co.* 9 Wend. 383; *Exchange Bank of Columbus* v. *Hines, supra.*

It is also true that a bank may sue and be sued and that it is liable for its endorsement on commercial paper. One of the commonest modes of transferring promissory notes and other negotiable commercial paper of like character is by endorsement. (*People's Bank* v. *National Bank,* 101 U. S. 181.) No question of endorsement appears here. Bonds such as these ordinarily pass from hand to hand without endorsement and without an endorser's liability thereon. Argument that agreements of the character here shown are in accord with sound banking principles has little to commend it in the light of the grave dangers to deposits and trust funds inherent in such agreements. It is a universally recognized concern of government that banks of deposit carrying deposits and trust funds shall be so regulated and conducted as to afford the greatest possible security to depositors and *cestui que trustents.* To this end

statutes require that periodical statements of the condition of banks be made to a department of government. Periodical inspections are made by officers of the government, and powers are given to the government to disapprove certain of a bank's transactions. These regulations are based on the fixed purpose to secure the greatest possible safety to funds intrusted with banks. Courts and legislatures are alike presumed to know the effect on the bank's deposits of unsafe banking practices.

An outstanding characteristic of such an agreement as is before us is that it creates against the bank a contingent liability which cannot be measured or determined in prospect and can be determined day by day only by reading the shifting market value of the particular bonds guaranteed. Such contingent liability is not, and cannot be, accurately reported to the public officers having a right to a report upon the condition of such bank. So long as bonds sold under an agreement command a selling price above that guaranteed by the bank the vendee will not return them. An inducement to return the bonds arises out of a depressed market. If a bank sell at par, with such re-purchase agreements, real estate mortgage bonds amounting to $500,000, which because of a shrinkage in real estate values (now no longer considered impossible) were reduced to a valuation of $100,000 or less, a liability of $400,000 thus comes into existence, threatening, and in many cases utterly destroying, the safety of deposits and trust funds. Notwithstanding this, the bank has no control or influence over such shifting values. Nor could it require the return of such bonds when the market began to show signs of decline and thus stop the mounting of liability. It must await the election of the vendee as to the return of the bonds, and meanwhile the contingent liability arising on its contract increases. Such a transaction can scarcely be said to bear resemblance to the ordinary endorsement of a note or bill of exchange, in which banks

are authorized to, and commonly do, deal, and which becomes by endorsement the obligation of the bank. The risk of complete destruction of a banking institution, and thus loss of deposits arising from the traffic in ordinary commercial bank paper by endorsement thereof is by no means comparable to the risk involved in the guaranty of a large number of real estate mortgage bonds, over which or their security the bank has no means of control. Such agreements are so fraught with danger to depositors and other creditors of the bank that it is inconceivable that any considerable number of bankers should deem them to be in accord with sound banking principles.

Speculation by a banking corporation with the funds deposited with it and its entry into the guaranty or surety business are neither within the principles of sound banking business nor the powers conferred by the statute under which it is organized, yet to insure the price of bonds, as was attempted by this agreement, is nothing short of a guaranty and possesses an inherent evil not found even in speculation, in that the bank cannot hope to re-purchase such bonds while they command a market price higher than that fixed in such agreement, hence no chance of gain exists. The guaranty of such bonds is not a transaction ordinarily and commonly considered to be within the scope of general banking business as that term is commonly used and understood, and cannot be said to come within the power conferred by the statute quoted, to do a general banking business. Nor is such power a necessary incident to the powers granted. (*Reichert* v. *Metropolitan Trust Co.* 247 N. W. (Mich.) 128; *Federal Land Bank of St. Paul* v. *Crookston Trust Co.* 230 N. W. (Minn.) 797; *First State Bank* v. *Sanford,* 255 S. W. (Tex.) 644; *Farmers and Mechanics Savings Bank* v. *Crookston State Bank,* 210 N. W. (Minn.) 998; *Hawkins Realty Co.* v. *Hawkins State Bank,* 205 Wis. 406, 236 N. W. 657.) Since this is so, it must be held that under the rule hereinbefore cited such power is pro-

hibited. As often stated by this court, one dealing with a banking or other corporation having limited and delegated powers is chargeable with notice of those powers and their limitation. *Steele* v. *Fraternal Tribunes,* 215 Ill. 190; *National Home Building Ass'n* v. *Home Savings Bank,* 181 id. 35; *Durkee* v. *People,* 155 id. 354.

Are such contracts as here relied upon void as against public policy or violative of statutory enactment? Contracts against public policy are generally unenforceable by any remedy. (Re-statement of the Law of 'Contracts, Am. Law Inst. sec. 369.) Public policy is a principle of law which holds that no one may lawfully do that which has a tendency to injure the public or to be against the public good. Banks are quasi-public institutions. Their well-being concerns not only the stockholders but the depositors and public at large. Contracts are against public policy when they tend to injure the public. Agreements such as are here involved fall within that category. Recent experience, so general as to afford the basis of judicial notice, has shown that contracts not within the powers conferred on banks and which so jeopardize the safety of bank deposits as to result in their loss, tend to produce widespread injury to the public, and may properly be held void though there be found no specific statutory prohibition against them. It is an academic rule of law that from the constitution and statutory enactments may be gleaned the public policy of the State. The General Assembly of this State in 1879 passed an act entitled, "An act for the protection of bank depositors," approved June 4, 1879. (Smith's Stat. 1931, chap. 38, par. 64.) Section 4 of this act is as follows: "It shall not be lawful for any savings bank, individual or individuals doing banking business, banking company, or incorporated bank receiving savings deposit, or deposits of trust funds, to assume the payment of, or to become liable for, or to guarantee to pay the principal of, or interest on, any bonds, notes or other evidence of

indebtedness of, for, or on account of any person or persons, company or incorporation; and in any assumption, liability or guarantee, whereby such deposits or trust funds could be jeopardized or impaired shall be null and void." This section has not heretofore been construed by this court. It seems clear, however, that payment or assumption of or guaranteeing to pay bonds of the character here involved is of the gist of the prohibition of this act applicable in any case where by any such contracted liability the deposits or the trust funds of the bank could become jeopardized or impaired. The act for the protection of bank depositors evidences an intention on the part of the legislature to declare contracts of the character before us void as against the public policy of the State. That act, section 4 of which is herein quoted, was enacted, as the title indicates, for the protection of bank depositors. Its enactment was for the public generally and should be construed to carry out that purpose. *People* v. *Tallmadge,* 328 Ill. 210.

It is argued, however, that these bonds and re-purchase agreements are not evidence of indebtedness of another but are the obligations of the bank, and that this fact renders inapplicable the statute quoted. With this we cannot agree. The bonds are evidences of indebtedness of the corporations which owned the real estate and executed the bonds, and by these agreements the bank's undertaking is to guarantee the bonds of those corporations. The fact that the bank may have received a commission for selling them in nowise renders the mortgage bonds obligations of the bank. It follows that agreements to re-purchase them at their face value, or with a deduction of one per cent for handling, as complainants construe these agreements, are agreements to assume or guarantee the payment of the evidences of indebtedness of another corporation, contrary to the express provisions of the act for protection of bank depositors. As it cannot be doubted that such an agreement could jeopardize or impair the deposits or

trust funds of the bank, such contract, because of its inherent danger to deposits and trust funds and because it is contrary to the public policy of the State, as evidenced by the legislative expression in section 4 of the statute quoted, is null and void.

But it is said the old bank having received the purchase price of these bonds is estopped from setting up the defense of *ultra vires*. Such defense is offered by the old bank and its receiver, the latter representing all the creditors of the old bank, including the depositors. Numerous cases of other jurisdictions have been cited to support the contention that the old bank having received the purchase price paid for these bonds is estopped to set up the defense of *ultra vires* without first returning the money paid it. We have seen, however, that these bonds were not the bonds of the bank, and it will be presumed that the mortgagor, a real estate corporation executing the bonds, received the amount paid by claimants less commissions charged for the sale. At most, if such contention be sound the bank could not be required to return more than the commissions received, the amount of which is not disclosed by the record. It may be further observed that the commission, if any was charged, was doubtless paid by the mortgagor.

Under the established law of this State the defense of *ultra vires* is available to the old bank when sued on a void agreement. It is said, however, that the complainants performed and executed their part of the agreement, and that it would not be good faith to permit the bank now to refuse. The same question was raised in *Steele* v. *Fraternal Tribunes, supra,* where this court said: "A contract of a corporation which is *ultra vires* in the proper sense of that term—that is to say, outside the object of its creation as defined by the laws of its organization, and therefore beyond the powers conferred upon it by the legislature—is not only voidable but wholly void and of no legal effect. The objection to the contract here is not merely that the

corporation ought not to have made it but that it could not lawfully make it. The contract could not be ratified by either party because it could not have been authorized by either. No performance by the parties could give the unlawful contract validity or become the foundation of any right of action upon it. * * * But when the contract is beyond the powers conferred upon it by existing laws, neither the corporation nor the other party to the contract can be estopped, by assenting to it or by acting upon it, to show that it was prohibited by those laws. The powers delegated by the State to corporations are matters of public law, of which no one can plead ignorance. A party dealing with a corporation having limited and delegated powers is chargeable with notice of those powers and their limitations and cannot plead his ignorance of their existence.—*National Home Building Ass'n* v. *Bank,* 181 Ill. 35; *Durkee* v. *People,* 155 id. 354; *Central Transportation Co.* v. *Pullman Palace Car Co.* 139 U. S. 24." A contract void because it is prohibited by law can in no manner be enforced. The law does not prohibit and also enforce a contract. (*DeKam* v. *City of Streator,* 316 Ill. 123; *Fritze* v. *Equitable Building and Loan Society, supra; Farmers and Mechanics Savings Bank* v. *Crookston State Bank, supra.*) Complainants are chargeable with notice that the old bank was utterly without power to make these repurchase agreements. The defense of *ultra vires* is properly urged here.

Counsel for complainants also argue that this agreement was not a re-purchase contract but a conditional sales contract; that the bonds were taken on condition that they might be returned, and that such a contract is enforceable. They cite *Wolf* v. *National Bank of Illinois,* 178 Ill. 85, and *Stewart* v. *Dodson,* 282 id. 192. In the former case the contention was that contracts similar in terms to those before us were options and gambling contracts. The court

held, however, that the record showed that it was the intention of the parties that the purchaser was to be allowed a certain time in which to elect whether he was to keep or return them, and so the transaction was a conditional sale. Such are not the facts here, but it is evident that complainants and the bank considered that the sale was completed and by a separate agreement the bank agreed to re-purchase the bonds. Such does not constitute a conditional sale. It was also there held that the transaction was not a gambling contract prohibited by section 130 of the Criminal Code. The statute for the protection of bank depositors was not called to the attention of the court. *Stewart* v. *Dodson, supra,* involved a contract for re-purchase between individuals and no question of limitation of powers arose. The question there was whether the agreement was a gambling contract, prohibited by section 130 of the Criminal Code. These cases are not controlling here. It seems clear here that both the evidence of the transaction itself and the theory on which the bill is brought preclude a construction of these agreements as conditional sales contracts. Complainants' evidence shows that they bought the bonds outright and that in the sale of these bonds to them the title passed. This is evidenced by the use complainants made of the bonds. Knass testified that he sold some of the bonds and returned others. The bill itself characterizes the memorandum of sale as a bill of sale. That these were sales is also evidenced by the fact that Knass used part of these bonds as security, not only with the bank from which they were purchased but with the new bank when his note was there renewed. Complainants also received interest on the bonds sold them, which they did not offer to return when tender was made of the bonds. The purchase price was paid in full, and what the purchasers did with the bonds lay entirely with them. They were under no obligations to return them and

no condition remained to be discharged in order to pass title. They could hypothecate them, sell them elsewhere, and were in nowise required to account to the bank. These were not conditional sales.

It is also argued that the appraisals of the property securing the mortgage bonds were fraudulent and known by the bank to be so, and that complainants should be allowed to rescind and receive the money they paid. Without analyzing the evidence as to fraud in the appraisals, it is sufficient to say that this record does not show an attempted rescission but an attempt to enforce the agreements. On an election to rescind the consideration must be returned. (*Glen* v. *Dodson,* 347 Ill. 473; *Wollenberger* v. *Hoover,* 346 id. 511.) As we have seen, no tender of interest was made when complainants demanded that the bonds be re-purchased. The bill seeks performance of the contract to re-purchase. Complainants must stand or fall with the case made by their bill.

What we have said in the consideration of these agreements obviates the necessity for considering the question whether they were, in fact, agreements of the bank. It is equally clear, since these agreements are not valid, that they can have no binding force or effect on the new bank. The judgment of the Appellate Court, in so far as it freed the new bank from these agreements, was right, but in so far as it sustained the superior court in its decree against the old bank and the receiver was in error.

The judgment of the Appellate Court and the decree of the superior court are reversed and the cause is remanded to the superior court, with directions to dismiss complainants' bill for want of equity.

*Reversed and remanded, with directions.*