Leo Awotin, Defendant in Error, v. Atlas Exchange National Bank of Chicago, Plaintiff in Error.

Gen. No. 37,307.

Opin-
ion filed June 15, 1934.

ELBRIDGE W. RICE, for plaintiff in error.

LLOYD C. WHITMAN, for defendant in error.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

On December 28, 1933, the defendant, Atlas Exchange National Bank of Chicago, sued out the present writ of error to reverse a judgment order of the circuit court, entered April 15, 1932, in substance as follows:

This cause coming on to be heard upon plaintiff's motion to strike defendant's affidavit of merits for *insufficiency* "upon the remandment of the cause upon the reversal thereof by the appellate court for the first district in accordance with the opinion rendered by it," and "for a judgment as of default on the affidavit of claim," and it appearing that "the affidavit of merits does not state any defense to plaintiff's cause of action" and that the court is therefore entitled to strike said affidavit of merits, it is "THEREFORE ORDERED that said affidavit of merits . . . is hereby stricken from the files in this cause."

And it further appearing from plaintiff's affidavit of claim, dated September 4, 1930, that there was due to plaintiff at said date the sum of $37,085.41, and that plaintiff is entitled to interest at 5 per cent on said sum from the date of the affidavit of claim to this day, which has been computed to be the sum of $2,756.25; and that the total damages sustained by plaintiff, and herein assessed against defendant, amount to the sum of $39,841.66; and that plaintiff is entitled to recover said total sum from defendant.

"WHEREUPON it is considered by the court that plaintiff have and recover of defendant his damages in the sum of $39,841.66"; and that the clerk of this court issue an execution in favor of plaintiff and against defendant "on the judgment herein now entered as aforesaid."

This is the second time the cause has been before us. From our former opinion (*Awotin v. Atlas Exchange Nat. Bank,* 265 Ill. App. 238), it appears that plaintiff's action against defendant (commenced August 19, 1930) is in assumpsit; that during March, 1931, on the issues made by the pleadings, the cause came on for trial before a jury; that at the conclusion of plaintiff's evidence the court, on defendant's motion, directed the jury to return a verdict in *defendant's* favor, which they did; that on May 23, 1931, judgment was entered upon the verdict against plaintiff for costs and he appealed to this court; and that on February 23, 1932, for reasons stated in the opinion, we reversed the judgment and remanded the cause, generally and without specific directions. In the opinion we outlined the pleadings, including the accompanying affidavits, as follows (pp. 239–41):

"Plaintiff's declaration consisted of a special count and the common counts. In the special count he alleged that on November 1, 1929, at Chicago, defendant offered to sell to him '$35,000 Dollars First National Company Collateral Trust, Series O, First Mortgage Real Estate 5½% Gold Bonds in denomination of $1,000 each, and then and there promised that, if plaintiff purchased the bonds and paid therefor the sum of $35,000, together with accrued interest thereon, it (defendant) would repurchase the bonds at maturity, paying therefor the par value of the bonds and accrued interest'; that plaintiff, in consideration thereof, on November 1, 1929, paid to defendant said sum and purchased the bonds from it; that to evidence the

agreement defendant reduced the same to writing and, as an inducement to plaintiff to purchase the bonds, then and there delivered to plaintiff the following writing:

Nov. 1, 1929.

" 'Mr. Leo Awotin,
1920 S. Halsted Street, Chicago.
Dear Sir:

" 'This is to acknowledge that we have this day sold you $35,000 par value First National Company, Collateral Trust, Series O, First Mortgage Real Estate $5\frac{1}{2}\%$ gold bonds, in denomination of $1,000 each, numbered as follows: #4584—4585 and 4612 to 4644, inclusive,

" '*Should you desire to resell these bonds to us, we hereby agree to repurchase same at maturity at par, or $35,000 and accrued interest.*

Yours very truly,
B. M. Blankenheim,
Cashier.'

"That the bonds matured on July 15, 1930; that on that day plaintiff presented them to defendant and demanded that it repurchase them and pay to plaintiff the sum of $35,000 and accrued interest; that defendant refused so to do; and that although plaintiff has made repeated demands on defendant since July 15, 1930, to the same effect it has not repurchased the bonds or paid to him the $35,000 and accrued interest or any part thereof, but still refuses. To plaintiff's damage, etc.

"In plaintiff's affidavit of amount due, attached to the declaration, and dated September 4, 1930, it is stated that his demand 'is for the sum of $37,085.41, due and owing to plaintiff from defendant *under its written agreement, dated November 1, 1929,* and that

there is due from defendant after allowing to it all just credits, deductions and set-offs $37,085.41.'

"Defendant entered its appearance by attorney, demanded a jury trial, and filed a plea of the general issue. In the accompanying affidavit of merits of Daniel M. Healy he alleged that he is the president of defendant, that there is not owing to plaintiff any sum of money, and that 'defendant did not enter into any agreement with plaintiff and never authorized or empowered anyone else to enter into the agreement alleged in the declaration or in the affidavit thereto attached.' On the eve of the trial defendant by leave of court, filed an additional plea alleging that it is a national bank, organized under the banking laws of the United States, that 'neither its charter nor the general law gives to defendant any power or authority whatever to guarantee payment of the indebtedness of any other person, firm or corporation nor to repurchase bonds at maturity,' and that the supposed guarantee or repurchase agreement of said Blankenheim, cashier, as set forth in the declaration, 'is ultra vires and void.' To this additional plea plaintiff filed a replication."

It also appears from the present record that there accompanied said additional plea an affidavit of merits, signed and sworn to by said Healy, stating:

"That there is not owing to plaintiff from defendant the sum of $37,085.41, or any other sum whatsoever; that the supposed agreement set forth in said declaration is not the agreement of defendant; that defendant never authorized or empowered anyone to execute the same; and that said supposed agreement is ultra vires and *void*."

And the bill of exceptions discloses that on April 9, 1932, after the mandate of this court had been filed, an attorney for plaintiff appeared in the circuit court, after notice to defendant, and moved the court "to

strike defendant's affidavit of merits from the files because of its *failure to state a meritorious defense,* and that judgment be entered against defendant, as in case of default, on the affidavit of claim attached to plaintiff's declaration''; and that on April 15, 1932, after arguments of respective counsel, the court granted the motion and entered the judgment now in question against defendant as first above mentioned.

In our former opinion, we quoted a portion of subsection 7 (as amended February 25, 1927) of section 5136 of the U. S. Revised Statutes, relating to the powers, etc. of National Banks, as follows:

''To exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits, by buying and selling exchange, coin and bullion, by loaning money on personal security; and by obtaining, issuing and circulating notes according to the provisions of this title: *Provided,* That the business of buying and selling *investment securities* shall hereafter *be limited* to buying and selling *without recourse* marketable obligations evidencing indebtedness of any person, copartnership, association, or corporation, in the form of *bonds,* notes and/or debentures, commonly known as investment securities, under such further definition of the term 'investment securities' as may by regulation be prescribed by the Comptroller of the Currency, . . . .''

We then stated the contentions of respective counsel as follows: (p. 243):

''Counsel for the bank contended in the trial court and contends here that under the above statute no recovery can be had by plaintiff in the present action, because the agreement of November 1, 1929, sued upon,

is ultra vires the bank and wholly void. Counsel for plaintiff contend in substance that the court erred in entering the judgment (following the directed verdict) because:

"(1)  The sale of the bonds by the bank to plaintiff, coupled with its written agreement to repurchase them at maturity at par and accrued interest amounts to a *conditional sale,* which is valid as such and the statute has no application; and

"(2)  Even if it be considered that the bank in making the repurchase agreement acted ultra vires, plaintiff, having tendered the bonds, is entitled to recover back what he paid therefor plus accrued interest on an *implied* assumpsit,—the bank having retained the moneys it received in the transaction."

And we expressed the opinion (p. 244), after considering the written agreement of November 1, 1929, the arguments of respective counsel and numerous adjudicated cases, that the trial court had erred in instructing the jury as it did and in entering the judgment against plaintiff. We then ·discussed said two contentions of plaintiff's counsel and expressed the opinion that there was substantial merit in each. As to the first contention we cited and quoted from the cases of *Wolf v. National Bank of Illinois,* 178 Ill. 85, 93–5, and *Freedman v. Madison & Kedzie State Bank,* 259 Ill. App. 519, 523–4. As to the second contention we cited and quoted from several cases decided by the Supreme Court of the United States. And we also discussed, and decided adversely to it, defendant's further contention that there could be no recovery by plaintiff in the case upon an *implied* promise or agreement.

After considering the pleadings and plaintiff's evidence and the stipulation introduced upon the *first* trial (as outlined on pages 241–2 of our former opinion), we think that it may reasonably be inferred that

the trial court, in directing the jury to return a verdict in defendant's favor and in entering the judgment, was of the opinion that no recovery could be had by plaintiff on the repurchase agreement sued upon because such agreement was ultra vires the bank and void upon grounds of public policy. And we also think that it may reasonably be inferred that the court, in taking the action it did on the *second* hearing, after remandment of the cause, and in entering the judgment of April 15, 1932, now in question, was moved to do so because of the decision and holdings in our former opinion.

On December 22, 1933 (six days before the present writ of error was sued out to reverse the judgment now in question) our Supreme Court decided the case of *Knass v. Madison & Kedzie State Bank*, 354 Ill. 554. In that case the first division of this Appellate Court, on March 6, 1933, had affirmed a decree, with certain modifications, of the superior court of Cook county (269 Ill. App. 588, 611), and the case reached the Supreme Court on appeal and certificate of importance granted. The Supreme Court reversed the judgment of the Appellate Court and the decree of the superior court, and remanded the cause to the superior court "with directions to dismiss complainant's bill for want of equity" (p. 572). In that case certain bonds were sold to complainants under certain "repurchase agreements" by the bank, which are similar to the repurchase agreement in the present case, in that it is stated in one repurchase agreement: "These bonds may be cashed at any time after one year at 99 and accrued interest or in three and one-half years at par"; and in the other: "Will purchase these bonds at any time after one year at 99, and after three and one-half years at par if desired." The bank was one organized under the laws of this State, as distinguished from one organized under the laws of the United

States, as is the defendant in the present case. In the opinion of the Supreme Court in the *Knass* case, after outlining the pleadings and stating certain facts, etc., it is said (p. 561): "Of first importance on this record is the question whether the repurchase agreements, assuming them to have been such and to have been made by the bank, are ultra vires the powers of the bank and contrary to the declared public policy of the State, and so unenforceable. This question has never been passed upon by this court."

Then follows in the opinion an exhaustive discussion of the question, accompanied with the citation of numerous adjudicated cases in this State and in other jurisdictions bearing upon it. In conclusion the court determined the question in the affirmative. And the court said (p. 567): "As often stated by this court, one dealing with a banking or other corporation having limited and delegated powers is chargeable with notice of those powers and their limitation." (Citing cases.) And in discussing the question whether the repurchase agreements were to be considered as being void as against public policy, the court said in part (pp. 567-8, italics ours):

"Are such contracts as here relied upon void as against public policy or violative of statutory enactment? Contracts against public policy are generally unenforceable by any remedy. (Re-statement of the Law of Contracts, Am. Law Ins., sec. 369.) Public policy is a principle of law which holds that no one may lawfully do that which has a tendency to injure the public or to be against the public good. Banks are quasi-public institutions. Their well-being concerns not only the stockholders but the depositors and public at large. Contracts are against public policy when they tend to injure the public. *Agreements such as are here involved fall within that category.* Recent experience, so general as to afford the basis of judicial

notice, has shown that contracts not within the powers conferred on banks and which so jeopardize the safety of bank deposits as to result in their loss, tend to produce widespread injury to the public, and may properly be held void *though there be found no specific statutory prohibition against them.* It is an academic rule of law that from the constitution and statutory enactments may be gleaned the public policy of the State. The General Assembly of this State in 1879 passed an act entitled 'An Act for the protection of bank depositors,' approved June 4, 1879. (Smith's Stat. 1931, Chap. 38, par. 64.) Section 4 of this act is as follows:

" 'It shall not be lawful for any savings bank, individual or individuals doing banking business, banking company, or incorporated bank receiving savings deposit, or deposits of trust funds, to assume the payment of, or to become liable for, or to guarantee to pay the principal of, or interest on, any bonds, notes or other evidence of indebtedness of, for, or on account of any person or persons, company or incorporation; and in any assumption, liability or guarantee, whereby such deposits or trust funds could be jeopardized or impaired shall be null and void.'

"This section has not heretofore been construed by this court. It seems clear, however, that payment or assumption of or guaranteeing to pay bonds of the character here involved is of the gist of the prohibition of this act applicable in any case where by any such contracted liability the deposits or the trust funds of the bank could become jeopardized or impaired. The act for the protection of bank depositors evidences an intention on the part of the legislature to declare contracts of the character before us *void as against the public policy of the State.* That act, section 4 of which is herein quoted, was enacted, as the title indicates, for the protection of bank depositors.

Its enactment was for the public generally and should be construed to carry out that purpose. (*People v. Tallmadge,* 328 Ill. 210.)''

And the court, after disagreeing with an argument made that the quoted statute was not applicable to the particular facts, further said in part (pp. 568–9):

''The bonds are evidences of indebtedness of the corporations which owned the real estate and executed the bonds, and by these agreements the bank's undertaking is to guarantee the bonds of those corporations. The fact that the bank may have received a commission for selling them in nowise renders the mortgage bonds obligations of the bank. It follows that agreements to repurchase them at their face value, or with a deduction of one per cent for handling, as complainants construe these agreements, are agreements to assume or guarantee the payment of the evidences of indebtedness of another corporation, contrary to the express provisions of the act for protection of bank depositors. As it cannot be doubted that such an agreement could jeopardize or impair the deposits or trust funds of the bank, such contract, because of its inherent danger to deposits and trust funds and because it is contrary to the public policy of the State, as evidenced by the legislative expression in section 4 of the statute quoted, is null and void.''

And the court, after stating a contention of the complainants (viz., that the old bank, having received the purchase price of the bonds in question, ''is *estopped* from setting up the defense of ultra vires'') decided against the contention, saying in part (pp. 569–70, italics ours):

''Under the established law of this State the defense of ultra vires is available to the old bank *when sued on a void agreement.* It is said, however, that the complainants performed and executed their part of the agreement, and that it would not be good faith

to permit the bank now to refuse. The same question was raised in *Steele v. Fraternal Tribunes, supra* (215 Ill. 190), where this court said (pp. 193–4):

" ' A contract of a corporation which is ultra vires in the proper sense of that term—that is to say, outside the object of its creation, as defined by the laws of its organization, and therefore beyond the powers conferred upon it by the legislature,—is not only voidable, but *wholly void and of no legal effect.* The objection to the contract here is not merely that the corporation *ought not* to have made it but that it *could not lawfully make it.* The contract could not be ratified by either party because it could not have been authorized by either. No performance by the parties could give the unlawful contract validity or become the foundation of any right of action upon it. . . . But when the contract is beyond the powers conferred upon it by existing laws, neither the corporation nor the other party to the contract can be estopped, by assenting to it or by acting upon it, to show that it was prohibited by those laws. The powers delegated by the State to corporations are matters of public law, of which no one can plead ignorance. A party dealing with a corporation having limited and delegated powers is chargeable with notice of those powers and their limitations and cannot plead his ignorance of their existence.' (Citing cases.)

"*A contract void because it is prohibited by law can in no manner be enforced.* The law does not prohibit and also enforce a contract. (Citing cases.) Complainants are chargeable with notice that the old bank was utterly without power to make these repurchase agreements. The defense of ultra vires is properly urged here."

And the court discussed, and decided adversely to them, complainants' contention that the agreements involved should not be considered as "repurchase

agreements" but as "conditional sales contracts." In support of the contention complainants had cited two cases,—one of which was *Wolf v. National Bank of Illinois,* 178 Ill. 85 (which this Appellate Court had referred to and relied upon in its said former opinion in the present case). But our Supreme Court, in its opinion in the *Knass* case, said in part (pp. 570–2, italics ours):

"In the *Wolf* case the contention was that contracts similar in terms to those before us were options and gambling contracts. The court held, however, that the record showed that it was the intention of the parties that the purchaser was to be allowed a certain time in which to elect whether he was to keep or return them, and so the transaction was a conditional sale. *Such are not the facts here,* but it is evident that complainants and the bank considered that the sale was completed and by a separate agreement the bank agreed to repurchase the bonds. *Such does not constitute a conditional sale. . . .* The statute for the protection of bank depositors was not called to the attention of the court. *Stewart v. Dodson,* 282 Ill. 192 (the other case cited by complainants in the *Knass* case), involved a contract for repurchase between individuals and no question of limitation of powers arose. *. . . These cases are not controlling here.* It seems clear here that both the evidence of the transaction itself and the theory on which the bill is brought *preclude a construction of these agreements as conditional sales contracts.* Complainants' evidence shows that they *bought the bonds outright* and that in the sale of these bonds to them the title passed. . . . Complainants also received interest on the bonds sold them, which they did not offer to return when tender was made of the bonds. The purchase price was paid in full, and what the purchasers did with the bonds lay entirely with them. They were under no obligations to return them and no condition remained to be

discharged in order to pass title. They could hypothecate them, sell them elsewhere, and were in nowise required to account to the bank. *These were not conditional sales.*"

On February 5, 1934 (before oral argument of the present cause was had in this court) the Supreme Court of the United States decided the case of *Texas & Pacific Ry. Co. v. Pottorff.* The opinion is published in the Supreme Court Reporter, Vol. 54, No. 7, at pages 416–20, and it there appears in substance that the Railway Co. filed a bill against Pottorff as receiver of a *national* bank at El Paso, Texas; that Pottorff filed a cross-bill; that after evidence heard the United States District Court entered a decree on his cross-bill and dismissed the bill of the Railway Company; that the decree was affirmed by the United States Circuit Court of Appeals (63 F. [2d] 1); and that on certiorari the Supreme Court also affirmed the decree. It is stated in the opinion that "the main question for decision is whether a *national* bank has *power* to pledge a part of its assets to secure a private deposit"; that the bank failed in September, 1931, at which time the Railway Company was and long prior thereto had been a depositor; that to secure it as such the bank, in January, 1931, had pledged $50,000 Liberty Bonds and held them for the Railway Company in the bank's trust department; that when the bank failed the Railway Company's balance in its regular checking account was $54,646, of which sum it made proof of claim as a secured creditor; that the receiver approved the amount of the claim but *denied the validity of the pledge,* and he tendered a dividend check only for the amount to which the Railway Company would have been entitled as an unsecured creditor; that thereupon the Railway Company filed its bill against the receiver "praying, in the alternative, that the bonds be delivered to it, or that they be sold for its benefit, or that the claim be paid in full with inter-

est''; that the receiver in his cross-bill prayed that the bank's title to the bonds be quieted; and that the District Court in its decree held that ''the pledge *was void* and that the Liberty Bonds constituted assets to be administered for the benefit of the general creditors of the bank,'' which decree was affirmed by the Circuit Court of Appeals. It is further stated in the opinion that the Railway Company contended (1) ''that the bank had power to make the pledge; (2) that even if the bank did not have such power, the receiver is not in a position to question the validity of the pledge; and (3) that even if he is not estopped from doing so, he may not disaffirm it *without returning the consideration therefor received by the bank.*'' And the Supreme Court expressed the opinion that ''none of these contentions is sound.'' And after setting forth certain additional facts as found by the District Court, the Supreme Court made numerous holdings, which are epitomized in the syllabi of the case as reported, in substance as follows: (1) That national banks *lack power* to pledge their assets to secure private deposits; (2) that the measure of powers of such banks is statutory grant, and powers *not conferred* by Congress *are denied;* (3) that the court takes judicial notice of facts indicating that among national banks the practice of pledging assets must have been deemed *contrary to good banking practice;* (4) that a receiver for an insolvent national bank is *not estopped* to deny the validity of a pledge of assets to secure a private deposit; (5) that no rights arise on an ultra vires contract, even though the contract has been fully performed; (6) that it is the duty of the receiver of an insolvent corporation to take steps to set aside transactions which fraudulently or illegally reduce the assets available for the general creditors, even though the corporation itself was not in a position to do so; and (7) that the receiver of an insolvent national bank may assert the invalidity of a pledge of assets to se-

cure a private deposit without making restitution by paying the pledgee's claim in full. And the court, as to the above propositions, Nos. 4 and 5, said (p. 420, italics ours):

"The receiver is not estopped to deny the validity of the pledge. The railway's argument is that the bank could not set up the defense of ultra vires since it had the benefit of the transaction; and that the receiver, as its representative, can have no greater right. *Neither branch of the argument is well founded. The bank itself could have set aside this transaction.* It is the settled doctrine of this court that *no rights arise* on an ultra vires contract, *even though the contract has been performed;* and that this conclusion *cannot be circumvented by erecting an estoppel which would prevent challenging the legality of a power exercised.*" (Citing cases.)

Counsel for the Atlas Bank, as grounds for a reversal of the present judgment, contends that the decisions and holdings in the *Knass* and *Pottorff* cases, *supra,* are decisive and controlling as to the issues here involved; that no recovery can be had by plaintiff (Awotin) by virtue of the written agreement of November 1, 1929, sued upon, and as set forth in the special count of plaintiff's declaration hereinabove mentioned; and that it should be held that the making of such an agreement was ultra vires the bank and against public policy and that, hence, the agreement is void and unenforceable. And counsel argues in substance that, notwithstanding the fact that in the *Knass* case the defendant was an Illinois banking corporation while in the present case defendant is a *national* bank, the respective statutes (above set forth) as to their powers, and as to the limitations on their powers, are similar, and that the decision and holdings in the *Knass* case can here properly be applied. It will be noticed that in subsection 7 (as amended in 1927) of the National Bank Act, the proviso reads in part:

"Provided, that the business of buying and selling investment securities shall hereafter be *limited* to buying and selling *without recourse* marketable obligations . . . in the form of bonds, notes and/or debentures, commonly known as 'investment securities,' . . . " The terms "without recourse" or "no recourse" have well settled meanings. In Anderson's Dictionary of Law, 1893, p. 865, it is said that by the use of the former stated words "the holder of negotiable paper may transfer title without incurring the responsibility of an indorser." In Webster's New International Dictionary, 1933, p. 1785, it is said that the words, "when added to the indorsement of a negotiable instrument, protect the indorser from liability to the indorsee and subsequent holders." And in *Lyons v. Fitzpatrick,* 52 La. Ann. 697, 699, it is said: "Words are to be understood in their ordinary significance. 'No recourse' means no access to, no return, no coming back upon, no assumption of any liability whatsoever, no looking to the party using the term for any reimbursement in case of loss, or damage, or failure of consideration in . that which was the cause, the motive, the object, of the undertaking or contract."

After again considering the pleadings in the present case and the written agreement of November 1, 1929, sued upon, and in view of the decisions and holdings in said *Knass* and *Pottorff* cases, we are of the opinion that the present judgment of April 15, 1932, cannot stand because it is contrary to the law. And we are now of the belief that, when on February 23, 1932, on the former appeal, we entered our former judgment (reversing the former judgment of the circuit court in favor of defendant and remanding the cause generally), we acted erroneously.

One of the contentions here made by counsel for plaintiff is that our holdings and decisions on said former appeal are "binding" upon us in the present writ

of error cause. In other words the contention is in substance that, under the rule or doctrine of the "Law of the Case," we should affirm the present judgment. We cannot agree with the contention. In 2 R. C. L., p. 226, sec. 188, in discussing the limitations of the general rule, the writer says: "The better rule, and that more in accord with justice, however, is that though ordinarily a question considered and determined on the first appeal is deemed to be settled and not open to re-examination on a second appeal, it is not an inflexible rule, and if the prior decision is palpably erroneous it is competent for the court to correct it on the second appeal. This may be said to be the view which has for its support the trend of modern authority, . . . " In *Zerulla v. Supreme Lodge,* 223 Ill. 518, it was decided that a proposition of law laid down by an Appellate Court of Illinois, upon reversing a judgment *generally* and remanding the cause, is not binding upon that court upon a second appeal, where the Supreme Court has since the first appeal decided the point involved contrary to the proposition laid down. And the court said (pp. 519–20, italics ours):

"Plaintiff in error contends that the law of the case was settled and announced by the Appellate Court the first time the case was before that tribunal and before the decision of this court in the *Seitzinger* case (204 Ill. 58) was filed, and that the law as announced by the Appellate Court at that time must govern the future progress and determination of this case. . . . The judgment and order of the Appellate Court" (on the first appeal to it, 99 Ill. App. 630, 637), "reversing and remanding the case was general in its terms and contained no directions to the trial court. It was neither final nor conclusive between the parties, no appeal could have been prosecuted from it, and it was, therefore, not *res adjudicata.* (Citing cases.) Where the Appellate Court or this court, on

the first appeal to it, announces a particular view of the law governing the case and reverses and remands the case for further proceedings in accordance with the views announced, if the case is again brought before such court for review the former decision is binding on the court making it, and the questions decided and determined by it on the first appeal are not open for reconsideration on the second appeal. But while the determination of a question of law by the Appellate Court on the first appeal may, as a general rule, be binding upon it on the second appeal, it certainly cannot be binding on this court. *Nor would the Appellate Court on the second appeal,* we apprehend, *be obliged to adhere* to a proposition of law laid down on the first appeal, when this court had, *since the first appeal,* decided the *precise question* contrary to the rule announced by the Appellate Court. *To so hold would lead to most illogical results."*

Reference may also be made to other adjudicated cases bearing upon the question: *Messinger v. Anderson,* 225 U. S. 436, 444; *Johnson v. Cadillac Motor Car Co.,* 261 Fed. (C. C. A.) 878, 886; *City of Hastings v. Foxworthy,* 45 Neb. 676, 699; *Missouri, K. & T. Ry. Co. v. Merrill,* 65 Kan. 436, 451. In the *Messinger* case it is said (p. 444, italics ours): "In the absence of statute the phrase, law of the case, as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, *not a limit to their power."* In the *Johnson* case (p. 886) it is said: "We recognize the full force and effect of the doctrine of *stare decisis* and the general rule that on a second appeal matters disposed of on the first appeal ordinarily will not again be considered. . . . But the rule is not an inexorable one, and should not be adhered to in a case in which the court has committed an error which results in injustice, and at the same time lays

down a principle of law for future guidance which is unsound and contrary to the interests of society.''

Another contention of plaintiff's counsel is in substance that the circuit court on the second hearing properly struck for insufficiency defendant's affidavit of merits (which accompanied its additional plea to plaintiff's declaration), and properly entered the judgment of April 15, 1932, now in question, for the reason that the affidavit stated ''mere conclusions and not the essential facts.'' In our opinion the contention is lacking in merit. The affidavit is set forth in a foregoing paragraph of this opinion. It alleges *inter alia* that ''there is not owing to plaintiff from defendant the sum of $37,085.41, or any other sum whatsoever,' and that the agreement, set forth in plaintiff's declaration is ultra vires and *void*.'' No question was raised as to the sufficiency of the affidavit at or prior to the time of the first trial. And on the second hearing, as appears from the present judgment order, first herein mentioned, plaintiff's motion to strike said affidavit for insufficiency was apparently based ''upon the remandment of the cause upon the reversal thereof by the Appellate Court for the first district in accordance with the opinion rendered by it.'' Furthermore, we think that the affidavit was sufficient to give notice to plaintiff that one of the defenses to plaintiff's action was that the repurchase agreement sued upon was ultra vires the bank to make, and *void* in law and, hence, unenforceable. There was sufficient notice of the nature of the defense. (See *Firestone Tire & Rubber Co. v. Ginsburg,* 285 Ill. 132, 136; *Thayer v. Bolender,* 250 Ill. App. 16, 22; *Runyan v. Moon,* 267 Ill. App. 312, 314.)

Plaintiff's counsel also contends that ''even if it be considered that the bank in making the repurchase agreement acted ultra vires, plaintiffs, having tendered the bonds, is entitled to recover back what he paid therefor, plus accrued interest, on an implied

*assumpsit.*'' It is our opinion that this contention is also without merit. Plaintiff's affidavit of claim accompanying his declaration does not disclose that he is seeking a recovery on the theory of an implied assumpsit after having tendered back the bonds, but rather by virtue of said repurchase agreement of November 1, 1929. Furthermore, as stated in the opinion in the *Pottorff* case, *supra,* it is the settled doctrine of the Supreme Court of the United States that "no rights arise on an ultra vires contract even though the contract has been performed." This is also the settled law of this State as appears from the opinion in the *Knass* case, *supra* (pp. 569–70). And we think that under said decisions and holdings plaintiff's counsel's further contention, that defendant cannot avoid the contract on the ground that it is ultra vires "without tendering to plaintiff the money defendant received from plaintiff" is equally without merit.

After this cause had been orally argued by respective counsel, we allowed plaintiff's counsel to file certain typewritten suggestions on points mentioned and arising on said oral argument and thereafter certain counter suggestions were filed by defendant's counsel. We have reviewed these suggestions but are of the opinion that a discussion of them is here unnecessary in view of the record before us and the decisions and holdings in said *Pottorff* and *Knass* cases, *supra.*

Our conclusions are that the circuit court erred in entering against defendant the judgment of April 15, 1932, in question; that said judgment should be reversed; and that as the law will not allow any recovery to be had by plaintiff against defendant on the repurchase agreement of November 1, 1929, sued upon and as set forth in plaintiff's declaration, the case will not be remanded. Accordingly, the judgment is reversed.

*Reversed.*

Sullivan, P. J., and Scanlan, J., concur.