Brown *et al. v.* Fourth and First Nat. Bank *et al.*

(*Nashville,* December Term, 1936.)

Opinion filed February 27, 1937.[1]

---

[1]Designated for publication March 27, 1937.

372

RAYMOND J. LAHEY, of St. Louis, Mo., and HIGGINS & MOORE, of Nashville, for appellants.

SEAY, STOCKELL & EDWARDS, MADDIN & MADDIN, and BASS, BERRY & SIMS, all of Nashville, for appellees.

MR. JUSTICE DEHAVEN delivered the opinion of the Court.

[1] This cause is before the court on the appeal of complainants from the decree of the chancellor sustaining the demurrer of defendants, in part, and dismissing the bill; also, upon the appeal of defendants from the decree of the chancellor overruling the first eight grounds of the demurrer.

Complainants, ninety in number, seek by their bill herein to recover from the defendant banks payments made by them on their respective notes given in the purchase of shares of stock in the Missouri State Life Insurance Company.

It was alleged in the bill, in substance, that the complainants were employees of the Missouri State Life Insurance Company and purchased stock in that company under certain employees' stock purchase plans formulated by a committee, known as the Employees Stock Purchase Committee; that under the plans, there being few differences between them, it was contemplated that the committee would enlist some bank in the enterprise by entering into an arrangement through which the bank would become the purchaser or assignee of the notes of the subscribers, to which notes the shares of stock bought were to be attached to the notes as collateral, and the bank would pay the seller for the stock and look to the subscribers for reimbursement out of installment payments made on the notes, the bank charging a percentage for purchasing the notes; that the committee was to act with the understanding that the bank was to be the financially responsible party and the one with whom the subscribers were to deal, and to whom they would look for the observance of the terms and conditions set forth in the purchase plans.

It appears from the purchase plans, three in number, exhibited with the bill, that monthly deductions were to be made from the salaries of subscribing employees, in a stated amount, and turned over to the holders of stock purchase notes. The following appears in plan No. 2, and, in substance, in the other two plans:

*"Withdrawal from Plan.* Subscribers under this plan will have the right at any time before completion of the payments to rescind their purchase and withdraw all amounts paid thereunder, plus simple interest at 3½ per cent per annum, from the date of each payment to the date of withdrawal, deducting, however, from the total so to be returned the amount of cash dividends which the subscriber shall have received from the Company on his stock."

*"Default.* Upon default of the subscriber under this plan for a period of more than ninety (90) days on any payment of principal or interest, he shall be deemed to have rescinded his contract and exercised the option of withdrawal heretofore provided and all his rights hereunder shall be satisfied by the refund of the amounts paid with interest and less dividends, as provided in the paragraph relating to withdrawals."

*"Stock Released.* All stock to which the subscriber releases or loses his title under the provisions heretofore made as to withdrawal from plan, termination of employment, or default, may at the option of the Committee, be taken by it for reallotment to others eligible under the terms of his plan, at a price and upon terms and conditions to be fixed by the Committee or may be permitted to revert to the Bankers."

It further appears that each plan had its appropriate form of application to be executed by the employee. If the application was accepted, the employee executed a note payable in blank to be filled out by the bank taking the note. The notes were in the following form:

"Stock Purchase Note.

"$————                                              ————1928

"I Promise to pay to the order of Fourth & First

National Bank at —————  ————— Dollars, for value received, in the manner and form and under the terms and conditions stated in that certain Field Force Stock Purchase Plan No. 3 of Missouri State Life Insurance Company, this note being given under said plan, and ————— shares of the capital stock of said Company, evidenced by Certificate No. —————, and any increases or additions thereto are hereby pledged as security herefor, under the terms and conditions of said plan.

"————————————

"Address: ——————————"

The employee executed a request, addressed to the Missouri State Life Insurance Company, to deduct from his salary each month the amount of the monthly payment due under his stock subscription and providing: "Such deduction shall cease upon the completion of the paying period as provided in the plan, or upon written notice by me of the cancellation of this order."

It was further alleged that defendant, Fourth and First Bank, doing business at Nashville, Tenn., agreed to become the financial agent contemplated in the stock purchase plans before referred to, and pursuant to a contract or agreement made with the committee it became the purchaser of the several notes of complainants and the pledgee and holder of the several shares of stock subscribed by complainants; that the Fourth and First National Bank, in November, 1930, merged with the defendant, American National Bank, the latter taking over practically all of the assets and the business of the former, and took over all the transactions in which complainants were concerned.

It was further alleged that the Fourth and First National Bank took each and every note, executed by the stock subscribers, with the distinct notice and understanding that it was to perform the obligations provided in said plans, including the obligation to refund, or make provisions for refunding, to each subscriber the several sums paid in by the subscribers, provided it was notified that the subscriber intended to exercise withdrawal privileges stipulated for in said plans; that the American National Bank, when it took over the affairs of the Fourth and First National Bank, and particularly the several notes of complainants and continued to receive the installments promised by the makers of stock purchase notes, was also informed expressly or constructively of the provisions of said plans and of the notes, and thus became onerated with the obligation to refund to all withdrawing subscribers, to the several amounts paid by them, together with interest at 3½ per cent per annum on the several sums paid.

It was further alleged that each of the complainants gave to the defendant banks due notice of their desire to withdraw, and have made demand upon said banks for settlement of their claims, but have not been able to obtain satisfaction.

The bill sets forth, in tabulated form, the number of shares purchased by the several complainants, the date of the request for refund, the net principal paid, and interest thereon as of April 15, 1936, which comprise the total sum alleged to be jointly due and owing each complainant. The aggregate total sued for is approximately $50,000. Complainants prayed that they be granted a decree for the several amounts paid by them to the defendant banks, with interest. By amendment to the

bill, complainants prayed in the alternative for a recovery of the several sums paid by them to defendant banks, if the court should find the several transactions were *ultra vires* and not in violation of the amendment of February 25, 1927, of the National Banking Act.

With respect to the defendant, M. E. Barr, alleged to be cashier of the American National Bank, the bill seeks a discovery of all records of the bank available to him bearing upon the transactions in question.

[2] The demurrers of the respective defendants raised identical questions. The first eight grounds of the demurrer challenged the bill as being multifarious. These were overruled by the chancellor. The ninth ground of the demurrer is directed to the proposition that under the facts stated in the bill, the agreements alleged to have been made by defendants are *ultra vires* a national banking corporation, void and unenforceable by complainants. The tenth ground of demurrer made the question that the contract sought to be enforced against the banks was forbidden by the National Banking Act of February 25, 1927, and is against public policy and, therefore, null and void. The chancellor sustained the ninth and tenth grounds of the demurrer and dismissed the bill.

Complainants on their appeal to this court have made six assignments of error which may be grouped as follows: (1) That it was error for the chancellor to hold that the several transactions between complainants and the Fourth and First National Bank, evidenced by their several promissory notes and the stock purchase plans, were *ultra vires* and void; (2) that it was error for the chancellor to hold that the agreement embraced in the stock purchase plans whereby the right of stock purchasers to withdraw and cancel their contracts and de-

mand return of the several installments paid by them rendered the notes void because in violation of the 1927 amendment to the National Banking Act; (3) that it was error for the chancellor to refuse to sustain the bill as a suit for money had and received; (4) that it was error for the chancellor to dismiss the bill in advance of the discovery from M. E. Barr sought by complainants.

[3] The validity or invalidity of the contracts here in question must be determined by the Acts of Congress setting forth the powers and authority of national banks. The corporate powers of such banks are found in section 5136 of the Revised Statutes of the United States. By the amendment of February 25, 1927 (chapter 191, sec. 2, 44 Stat. at L., 1224, 1226, see 12 U. S. C. A., sec. 24), the following was added to paragraph 7 of said section:

"Provided, That the business of buying and selling investment securities shall hereafter be limited to buying and selling without recourse marketable obligations evidencing indebtedness of any person, . . . or corporation, in the form of bonds, notes and/or debentures, commonly known as investment securities, under such further definition of the term 'investment securities' as may by regulation be prescribed by the Comptroller of the Currency."

The effect of this amendment has recently been considered by the Supreme Court of the United States in *Awotin* v. *Atlas Exchange National Bank of Chicago,* 295 U. S., 209, 55 S. Ct., 674, 676, 79 L. Ed., 1393. In that case Awotin purchased of the bank, at par, thirty-five $1,000 mortgage bonds of the First National Company Collateral Trust. Contemporaneously with the purchase, and as an inducement and part consideration for it, respondent bank agreed in writing at Awotin's option to

repurchase the bonds at maturity, at par and accrued interest. The case went to the Supreme Court of the United States on *certiorari* to review the decision of the Illinois Appellate Court (275 Ill. App., 530) that the bank incurred no liability in consequence of its failure to perform its contract with petitioner to repurchase the bonds at maturity. The contention of petitioner was that the words of the statute, "without recourse," must be taken to have only the technical legal significance in which they are used to limit the liability of an indorser of negotiable paper, as meaning without liability as an indorser or guarantor of the obligation of a third party. The court said:

"But when the words are read in their context, and in the light of the evident purpose of the proviso, it is apparent that they were intended to have a broader meaning and one more consonant with all the different forms of business to which the proviso relates."

The court further said:

"Both the form and purpose of the statute impel the conclusion that the words were used in a broad and nontechnical sense, as precluding, at least, any form of arrangement or agreement in consequence of which the bank is obligated to save the purchaser harmless from loss incurred by reason of his purchase. . . .

"Respondent, by agreeing to repurchase the bonds at the same price petitioner had paid for them, plus their accrued interest, undertook to save petitioner harmless for all risk of loss on his purchase, as effectively as if it had indorsed the bonds without restriction or had guaranteed their payment at maturity. The contract was therefore one which the statute prohibits and for the breach of which the law affords no remedy."

It is the position of complainants that the several transactions had with the Fourth and First National Bank, mentioned in the bill, were but loans of money by means of the discounting of notes payable in installments, to which shares of stock were attached as collateral. We are unable to agree to this contention. The transactions amounted to a guaranty on the part of the bank that if the subscribers rescinded their contract to purchase it would refund all sums paid on the stock. The bank paid the price of the stock to the seller and looked to the subscribers for reimbursement under an agreement that at any time they might rescind and withdraw all they had paid on the purchase price of the stock. Thus the bank assumed the whole risk of loss. If the value of the stock decreased, the subscriber could rescind and get back all he had paid. If the value of the stock increased, the subscriber got the benefit of the increase.

By engaging in the transactions in question, the bank created a contingent liability to a large amount. It paid out approximately $100,000 in the purchase of the stock and subjected itself to the demands of withdrawing stockholders to the amount of $50,000. If the stock declined in value, it had to await the election of the subscribers as to whether they would withdraw or not, and meanwhile the contingent liability arising out of the transactions increasing. The interests of stockholders of the bank and its depositors were jeopardized by the agreement. The sudden maturing of the demands of the subscribers, by concurring withdrawals, might easily have absorbed a substantial part of the bank's capital. Every bank, it has been said, is charged with duties to the public. It is more than a mere private corporation

for profit. *Greene* v. *First Nat. Bank,* 172 Minn., 310, 215 N. W., 213, 60 A. L. R., 814. In the *Awotin Case, supra,* the court said that national banks are public institutions and the purpose and effect of the statute is to protect their depositors and stockholders and the public from the hazard of contingent liabilities, attendant upon the assumption by the bank of the risk of loss by its customers, resulting from the permitted dealing in securities by the bank.

The business of buying and selling investment securities by national banks is limited to the buying and selling "without recourse." The bank under the facts averred in the bill was a party to transactions involving the purchase and sale of stock in the Missouri State Life Insurance Company and bound itself, in effect, to hold the purchasers harmless from loss by reason of their purchases. Under the broad interpretation given the amendment of February 25, 1927, by the court in *Awotin* v. *Atlas Exchange National Bank, supra,* the scheme or arrangement into which the bank entered falls within the prohibitions of the statute and the contracts sued on are void as to the defendant banks.

[4] If the invalidity of the contracts was due to a mere absence of power in the bank to enter into them, "restitution, not inequitable to the bank or inimical to the public interest, might be compelled," as stated in the *Awotin Case, supra.* The powers enumerated in section 5136 of the Revised Statutes of the United States, as amended, do not authorize a transaction such as is here presented. In *Knass* v. *Madison and Kedzie State Bank,* 354 Ill., 554, 188 N. E., 836, 840, it was said: "Every power that is not clearly granted is withheld." *California Nat. Bank* v. *Kennedy,* 167 U. S., 362, 17 S. Ct.,

831, 42 L. Ed., 198. If the contracts were not void because prohibited by the amendment of February 25, 1927, equity would not allow restitution of the amounts paid by complainants under the facts disclosed in the bill. Brown, the first-named complainant, on his application for stock, caused the bank to pay out of its funds some $2,210, for which he executed his note. He repaid only $686. Would it be equitable to the bank, and to the public interest, to restore to him the $686 paid? We think not. The other complainants are in similar position. The restitution of the amounts paid would not place the bank *in statu quo*. On the contrary, it would further increase its loss and jeopardize the interests of its depositors, stockholders, and the public.

[5] Any discovery which defendant, M. E. Barr, might have made by producing the records of the bank could not make legal that which was illegal and void.

[6] Upon a careful consideration of the questions made, we are constrained to overrule the complainants' assignments of error and affirm the decree of the chancellor. Complainants will pay the costs of the appeal.